IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  12-cv-02116-RPM

MER, LLC., a Colorado limited liability company,

      Plaintiff,

v.

COMERICA BANK, a Texas banking association,

      Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PURSUANT TO
FED.R.CIV.P. 12(b)(1)

---

      This breach of contract action arises out of the Amended and Restated Credit Agreement ("the Amended Credit Agreement") dated April 18, 2008, between Mercury Companies, Inc. ("Mercury") and Comerica Bank ("Comerica" or "the defendant"), as the agent for a lending syndicate ("the Banks").

      Mercury, a Colorado corporation, filed for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the District of Colorado on August 28, 2008.  Mercury's Chapter 11 Plan was confirmed by the Bankruptcy Court in December 2010.

      In July 2012, MER, LLC ("MER" or "the plaintiff") commenced this action in state court, alleging that Comerica breached the Amended Credit Agreement.  The plaintiff alleges that the claim that is the subject of the complaint was assigned to it by Mercury in March 2011, after the confirmation of Mercury's Chapter 11 Plan.

-1-

The action was removed to federal court on the basis of diversity of citizenship.[1]

Comerica moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), arguing that the plaintiff lacks standing for three reasons: (1) the claims were not validly assigned to the plaintiff; (2) the claims were not preserved in Mercury's Chapter 11 Plan, and (3) the claims are barred by the doctrine of judicial estoppel. Comerica also moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), arguing that the plaintiff's breach of contract claim fails as a matter of law.

In support of its motion for dismissal, Comerica submitted the following documents:

Ex. A (dkt. #4-2) – Chapter 11 Plan of Mercury Companies, Inc., *In re Mercury Companies, Inc., debtor,* Bankruptcy Case No. 08-23125, in the United States Bankruptcy Court for the District of Colorado;

Ex. B (dkt. #4-3) – Disclosure Statement for Mercury's Chapter 11 Plan, dated July 14, 2010;

Ex. C (dkt. #4-4) – Docket report , *In re Mercury Companies, Inc., debtor,* Bankruptcy Case No. 08-23125, for the period from August 28, 2008 through August 14, 2012;

Ex. D (dkt. #4-5) – The plaintiff's Initial Disclosures from when this action was proceeding as *MER, LLC v. Comerica Bank*, Case Number 12CV4294, in the City and County of Denver, Colorado (Def.'s Ex. D), and

Amended Credit Agreement (dkt. #4-7), attached as Exhibit 1 the Declaration of Charles E. Pohl, an Executive Vice President of the Financial Services Division of Comerica (dkt. #4-6).

The plaintiff opposed dismissal and submitted with its response brief the Schedule B Personal Property list from Mercury's Statement of Financial Affairs and Schedules, which was

---

[1] The action was commenced as *MER, LLC v. Comerica Bank*, Case Number 12CV4294, in the City and County of Denver, Colorado.

filed in the Chapter 11 bankruptcy proceeding in September 2008. Pl.'s Ex. 1; *see also* Def.'s Ex. C.

The complaint refers to Amended Credit Agreement and incorporates it by reference. The other documents submitted with the briefs relate to the defendant's Rule 12(b)(1) challenge to the plaintiff's standing. The authenticity of those documents is not disputed and the court may take judicial notice of them. "Unlike the strict limitations under 12(b)(6) against considering matters outside the complaint, a 12(b)(1) motion ... can include references to evidence extraneous to the complaint without converting it to a Rule 56 motion." *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir.1987), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987).

The following statement of facts is derived from the allegations of the Amended Complaint and the documents submitted with the briefs.

Mercury was founded in Colorado in 1947 as "Security Abstract Company of Jefferson County" by Paul Hauptman. Compl. ¶ 16.[2] Paul's son, Jerrold, took over the management in 1978. He expanded the company throughout the 1980s and created a holding company which became Mercury. Mercury and its subsidiaries provided real estate-based products and services, including real estate title and escrow closing services. *Id.*

Mercury expanded rapidly in the mid-1990s, when it purchased or formed title agent subsidiaries in California, Arizona and Texas and opened offices in Nevada, Florida and Oregon. ¶ 17. Mercury's Colorado subsidiaries were Heritage Companies, Inc. and its subsidiaries,

---

[2]Unless otherwise stated, references to paragraph numbers (i.e. ¶ 16), refer to the allegations of the Amended Complaint.

Security Title Guaranty Co., Title American, Inc. and USA Digital Solutions, Inc. (the "Colorado Subsidiaries"). ¶18. Its major California subsidiary was Alliance Title Company, Inc. ("Alliance"). *Id.* Mercury also owned Remington Holdings, Inc. ("Remington"), a holding company for subsidiaries that developed and constructed a number of residential subdivisions in Colorado. ¶ 19.

In 2007, Mercury had a $100 million credit facility with the Banks. ¶ 21. That credit facility ("Former Credit Agreement ") covered two loans and a $50 million revolving line of credit, which Mercury had not drawn upon. *Id.*

Mercury's largest underwriter of title insurance was First American Title Insurance Company and its wholly owned subsidiary American Financial Corporation ("First American"). ¶ 22. Mercury's Colorado Subsidiaries and First American entered into Exclusivity Agreements, which gave the Colorado Subsidiaries the exclusive right to write First American's policies in Colorado. Mercury did substantial business with First American in other states as well. ¶¶ 22-23.

First American invested approximately $100 million in various forms of debt and equity in Mercury. In one such transaction, First American loaned $15 million to Mercury, which debt could be converted to equity at Mercury's election (the "Put Right"). ¶ 24.

By 2007, disputes had arisen between Mercury and First American. Mercury accused First American of violating the Exclusivity Agreements (the "Exclusivity Dispute"). ¶ 25. Then, when Mercury notified First American that it intended to exercise the Put Right and exchange the $15 million of debt for equity, First American questioned the sufficiency of the notice (the "Put Right Dispute"). ¶ 26.

The terms of the Former Credit Agreement required Mercury to provide audited financial statements to the Banks. Mercury had engaged the accounting firm of KPMG to audit Mercury's 2007 consolidated financial statements. The disputes between Mercury and First American delayed KPMG's issuance of Mercury's 2007 Audited Financial Statements because a determination needed to be made about whether to treat the $15 million Put Right as debt or as equity. ¶¶ 27- 28.

In 2007 and 2008, Mercury's business was adversely impacted as home sales and refinancing declined. ¶ 31. In December of 2007, Mercury shut down Alliance (its major California subsidiary) and planned for Alliance's dissolution. ¶ 33.

By the end of 2007, Mercury had determined that it was entitled to an approximately $20 million federal tax refund resulting from the carry-back of 2007 net operating tax losses to prior years' taxable income (the "Tax Refund"). ¶ 30.

In late 2007 and early 2008, Mercury and the Banks renegotiated the terms of the Former Credit Agreement. These negotiations resulted in the Amended Credit Agreement, dated April 18, 2008.

The Amended Credit Agreement provided Mercury with two credit facilities referred to as Term Loan A and Term Loan B. Amended Credit Agreement, Recitals § A, B, §§ 4.1, 4.2. Term Loan A was a loan to Mercury in the principal amount of $45 million, for the purpose of refinancing Mercury's existing indebtedness under the Former Credit Agreement. *Id.* § 4.12. Term Loan B reaffirmed Mercury's obligations with respect to its guaranty of a defaulted loan to Alliance in the original principal amount of $10 million, which then had an unpaid principal balance of approximately $3.5 million. *Id*. § 4.1(b).

Mercury's payment obligations under the Amended Credit Agreement included an $8.75 million principal reduction payment due on the Effective Date of the Agreement and payments of principal and interest, which were due on scheduled dates. *Id.* § 4.3. The Amended Credit Agreement imposed other non-payment obligations on Mercury. It required Mercury to maintain at least $10 million of cash collateral in a restricted deposit account, which provided Comerica (as agent for the Banks) with a perfected security interest and exclusive control over such cash collateral. *Id.* § 1.1 (at pp. 14-15); § 7.21. The Amended Credit Agreement also required Mercury to maintain a certain level of Unrestricted Cash. The Agreement defined Unrestricted Cash as cash (other than Restricted Cash) and Cash Equivalents which Mercury or its subsidiaries had on deposit with Comerica or any Bank, provided Comerica had been granted a first priority security interest in such account(s) and (if at a Bank other than Comerica) had received an Account Control Agreement from such Bank. *Id.* § 1.1 (at p. 16); § 7.22.

The Amended Credit Agreement also imposed a number of affirmative covenants on Mercury, including obligations to:

- provide to Comerica the audited financial statements of Mercury and its subsidiaries within 120 days after the end of each fiscal year;

- maintain a Consolidated Leverage Ratio (as defined in the agreement) of not more than certain specified ratios as of specified dates;

- maintain, as of the end of each month and each quarter, a minimum Consolidated EBITDA (as defined in the agreement)[3], and

- file a Tax Refund claim and cause the proceeds of such refund to be directly deposited into a specified account as Unrestricted Cash.

---

[3]EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization.

*Id.* §§ 7.1(a); 7.10; 7.11, and 7.20. The Amended Credit Agreement included negative covenants, such as limitations on Mercury's debt, liens and guarantee obligations; limitations on mergers and other fundamental changes or sales of assets, and limitations on capital expenditures, investments, loans and advances. *Id.* § 8. The Amended Credit Agreement imposed reporting obligations on Mercury, including the furnishing of Daily Cash Summaries and monthly Covenant Compliance Reports to Comerica. § 7.2(a).

Section 4.11(a) of the Amended Credit Agreement provided:

> Until final payment in full of Term Loan A, if at any time and for any reason the aggregate outstanding principal amount of the Term Loan A and the Term Loan B Obligations hereunder shall exceed the Formula Amount, Borrower shall either (i) immediately repay an amount of Term Loan A equal to such excess, or (ii) increase its Restricted Cash or (after attaining Financial Compliance) its Unrestricted Cash, by an amount equal to such excess.

The agreement defined "Formula Amount" as an amount equal to the sum of Restricted Cash, plus 90 % of the Tax Refund, plus Unrestricted Cash. *Id.* § 1.1 (at p. 8). Financial Compliance was defined as Mercury's satisfaction of various conditions, including that there shall exist no default or event of default. *Id.*

The Amended Credit Agreement defined "default" as "any event which with the giving of notice or the passage of time, or both, would constitute an Event of Default under this Agreement." § 1.1 (at p. 6). The Agreement defined "Events of Default" as the occurrence of certain events, including the following:

> (a) non-payment when due of (i) the principal or interest on Term Loan A or the Term Loan B obligations, or (ii) any Fees or interest payment thereon and continuance thereof for five (5) business days.
>
> (b) non-payment of any money by Borrower under this Agreement or by any Loan Party under any of the other Loan Documents to which it is a party, other than set forth in subsection (a) above, within five (5) Business Days after notice from

> [Comerica] that the same is due and payable;
>
> (c) default in the observance or performance of any of the conditions, covenants or agreements of Borrower set forth in Sections 4.11, 7.1, 7.2, 7.4(a), 7.5, 7.6, 7.7(a) and (e), 7.9 through 7.11 ... provided that an Event of Default arising from a breach of Sections 7.1(a) through (c) or 7.2(a) through (d) shall be deemed to have been cured upon delivery of the required item ...

*Id.* § 9.1. There was also a cross-default provision, stating that if Mercury or any of its subsidiaries failed to comply with the terms of certain other indebtedness, such noncompliance constituted an Event of Default. § 9.1(f).

Comerica's rights upon an Event of Default were defined in Section 9.2, which provided:

> 9.2 <u>Exercise of Remedies</u>.  If an Event of Default has occurred and is continuing hereunder: (a) [Comerica] may, and shall, upon being directed to do so by the Majority Banks, declare the entire unpaid principal indebtedness, including the Notes, immediately due and payable, without presentment, notice or demand, all of which are hereby expressly waived by Borrower; ... and (c) [Comerica] may, and shall, if directed to do so by the Majority Banks or the Banks, as applicable (subject to the terms hereof), exercise any remedy permitted by this Agreement, the other Loan Documents or law.

Section 9.3 of the Agreement provided:

> 9.3 <u>Rights Cumulative</u>.  No delay or failure of [Comerica] and/or Banks in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege. The rights of [Comerica] and Banks under this Agreement are cumulative and not exclusive of any rights or remedies which Banks would otherwise have.

Section 9.6 of the Agreement further provided:

> 9.6 <u>Waiver of Defaults</u>.  No Event of Default shall be waived by the Banks except in a writing signed by an officer of [Comerica] in accordance with Section 13.10 hereof.  No single or partial exercise of any right, power or privilege hereunder, nor any delay in the exercise thereof, shall preclude other or further exercise of their rights by [Comerica] or the Banks. No waiver of any Event of Default shall extend to any other or further Events of Default. No forbearance on the part of [Comerica] or the Banks in enforcing any of their rights shall constitute a waiver of any of their

> rights. Borrower expressly agrees that this Section may not be waived or modified by the Banks or [Comerica] by course of performance.

Mercury timely paid all amounts that were due for principal and interest by March 31, 2008; April 30, 2008; May 15, 2008; June 16, 2008, and June 30, 2008, including the $8.75 million principal reduction payment. Am. Compl. ¶¶ 43, 44, 50, 56. However, Mercury failed to perform certain of its other obligations in a timely manner.

On May 15, 2008, Mercury provided to the Banks a Covenant Compliance Report for the period ending March 31, 2008, showing noncompliance with the Consolidated Leverage Ratio and noncompliance with the obligation to deliver audited statements by April 30, 2008. ¶ 45(iv), (vii).

On May 27, 2008, Comerica notified Mercury that its failure to comply with the Consolidated Leverage Ratio and failure to deliver the 2007 Audited Financial Statements constituted Defaults or Event of Defaults and reserved all rights to act on either of those defaults. ¶ 49.

On June 16, 2008, Mercury provided a Covenant Compliance Report for the period ending April 30, 2008, showing noncompliance with the Minimum Consolidated EBITDA. Mercury reported a negative EBITDA of $896,841, versus the stated minimum of negative $800,000 (a difference of $96,841). The report also showed noncompliance with a term of a land loan to Remington from Colorado State Bank & Trust, which implicated the cross-default provision in the Amended Credit Agreement. The Compliance Report dated June 16, 2008, also showed that Mercury still had not delivered its 2007 Audited Financial Statements. ¶ 51.

In July, 2008, Mercury obtained the Tax Refund and deposited it as required under the terms of the Amended Credit Agreement. ¶ 61.

In July 2008 (and previously), Mercury's Daily Cash Summaries showed that Mercury's Unrestricted Cash included approximately $6 million that Mercury had on deposit at U.S. Bank in accounts designated for employee health and welfare benefits ("the H&W Account"). ¶ 66. The H&W Account was for the administration of employer and employee contributions under the Mercury Employee Welfare Benefit Plan, which was a self insured, medical coverage plan for Mercury's employees. The Plan was covered by ERISA. ¶ 62.

On or about July 8, 2008, Comerica for the first time questioned whether the H&W Account should be included in the calculation of the Banks' cash collateral. The calculation of Mercury's Restricted and Unrestricted Cash was important to whether Mercury was in compliance with the requirements of § 4.11 of the Amended Credit Agreement.

Mercury and Comerica discussed procedures for ensuring that the H&W Account was covered by an Account Control Agreement. ¶ 69. In connection with those discussions, Comerica requested that Mercury supply an opinion letter from legal counsel confirming that the H&W Account could be pledged. ¶ 70.

On July 23, 2008, Mercury wired $ 4 million from H&W Account at U.S. Bank to an account at Comerica in which Comerica had a first priority security interest. Mercury told Comerica that this money was to be included as Unrestricted Cash and also told Comerica that it had received the requested opinion letter from independent ERISA counsel. ¶¶ 70- 71.

In the late evening of July 23, 2008, Comerica notified Mercury by email that the Banks had blocked Mercury's accounts. As justification for such action, Comerica's email stated that Mercury had failed to cure its previous defaults and had committed a new Event of Default by allowing the unpaid principal amount of the loans to exceed the Formula Amount because

-10-

Mercury had insufficient Unrestricted Cash to meet the Formula Amount, without inclusion of the H&W funds. ¶ 75.

On July 24, 2008, Mercury delivered the requested opinion letter to Comerica. ¶ 72.

On July 25, 2008, Comerica delivered a letter to Mercury: (a) declaring the entire unpaid balance of the Loans due and payable; (b) demanding immediate payment of all interest allegedly owing; (c) notifying Mercury that the $10 million in Restricted Cash would be applied to the payment of the amounts due on the Loans; and (d) notifying Mercury that the Banks had directed U.S. Bank to transfer all the Unrestricted Cash in Mercury's accounts there to Comerica and that the Banks would apply that Unrestricted Cash to amounts owed on the Loans. ¶ 76. Comerica asserted that five defaults by Mercury justified this action: (1) noncompliance with the Consolidated Leverage Ratio; (2) noncompliance with the Minimum Consolidated EBITDA; (3) noncompliance with respect to the Remington land loan, and (4) failure to deliver Audited 2007 Financial Statements, and (5) noncompliance with the Formula Amount requirement. ¶ 77.

The plaintiff refers to this action by Comerica as "the Sweep." With respect to each default that Comerica relied upon to justify the Sweep, the plaintiff alleges that as of July 23, 2008, Mercury had either complied with its obligation or had substantially performed and the default was an immaterial and could have been cured. *Id.*

After Comerica blocked Mercury's accounts, Mercury was unable to make payroll and pay other operating expenses and checks that had previously been drawn on the blocked accounts were dishonored and returned. ¶ 74. Facing pressure from state insurance and labor regulators, Mercury sold its Colorado Subsidiaries and one other subsidiary to Fidelity Title Insurance ("Fidelity") for $5 million, in a sale that was completed by August 5, 2008. ¶¶ 84-92.

After the Sweep, Comerica notified Mercury that $1,484,003.51 remained due under the Amended Credit Agreement and other related agreements. On August 8, 2008, Mercury paid that amount to Comerica and the Banks. ¶¶ 78-83.

On August 28, 2008, Mercury filed the action *In re Mercury Companies, Inc*. #08-2125-MER in the United States Bankruptcy Court for the District of Colorado, seeking relief under Chapter 11 of the Bankruptcy Code. ¶ 93; *see also* Def.'s Ex. C ("Bankruptcy docket sheet").[4]

In September 2008, when Mercury filed its Statement of Financial Affairs and Schedules in the Chapter 11 proceeding, Mercury listed "potential claims against Comerica Bank and the syndicated lending facility" as an asset on the Personal Property Schedule B. Pl.'s Ex. 1 ("Personal Property Schedule").

After Mercury filed its bankruptcy petition, it operated as debtor-in-possession and exercised the powers and duties of a trustee pursuant to the Bankruptcy Code. ¶ 95. Tom Connolly was appointed to take over as Mercury's CEO, replacing Jerrold Hauptman. Mercury operated its few remaining possessions and liquidated assets under Bankruptcy Court supervision. Disclosure Statement at p. 1.

On July 14, 2010, Mercury submitted its proposed Chapter 11 Plan and Disclosure Statement to the Bankruptcy Court. In the Disclosure Statement, Mercury disclosed pending litigation with Fidelity over the ownership of the Colorado subsidiaries; stated that Mercury was contemplating litigation against AIG (a creditor) with respect to an unresolved claim in the amount of $1,400,000, and explained that further claims litigation against Creditors was not

---

[4] Comerica and the lending syndicate it represented were not creditors in the Mercury Chapter 11 proceeding because they had been fully repaid.

anticipated but possible. Disclosure Statement § III(D)(1)-(3). With respect to other litigation, the Disclosure Statement stated:

> Mercury is continuing to evaluate other potential litigation claims it may hold, but has not identified any other litigation targets at this time. To the extent Mercury prevails on its litigation claims, the proceeds from such actions, net of fees and costs, shall be used to effectuate the Plan ....

*Id.* § III(D)(4) at p. 19.

Mercury's proposed Plan included the following provisions regarding the revesting of assets:

> a.  Except as provided in this Plan, on the Effective Date the property of the Estate shall remain vested in the Estate until the final decree in this case as provided in the Plan.
>
> b.  Tom H. Connolly, Esq. shall remain in his capacity as Chief Executive Officer of Debtor until entry of a final decree closing the Chapter 11 Case.
>
> * * *
>
> d.  In addition to any other powers described in this Plan, the powers and duties of the Debtor shall include, all of which may be undertaken without Court approval:
>
>> i.  To take control of, preserve, and convert to Cash property of the Estate, subject to the terms of this Plan;
>>
>> ii.  **To investigate and prosecute or abandon all Causes of Action belonging to or assertible [sic] by the Estate, including all Avoidance Claims**;
>> * * *
>> iv.  To compromise all disputes, including Causes of Action, Avoidance Claims and Objections to Claims;
>> * * *
>> vii.  To enter into contracts as necessary to assist in carrying out the powers and duties enumerated pursuant to this Plan;
>> * * *
>> xiii.  In general, without in any manner limiting any of the forgoing, to deal with the assets of the Estate or any part or parts thereof in all other ways as would be lawful for any person owning the same to deal therewith; ....

Plan, Art. VIII, § 8.02, at pp. 9-10 (emphasis added).

The proposed Plan also provided:

> Except as otherwise provided in the Plan…any and all Causes of Action accruing to the Debtor, or the Debtor in its capacity as debtor-in-possession, not released or compromised pursuant to this Plan, including, without limitation, actions under §§ 544, 545, 547, 548, 550, 551, and 553 of the Bankruptcy Code, shall remain assets of the Estate, and the Debtor shall have authority to prosecute such Causes of Action for the benefit of the Estate. On and after the Effective Date, the Debtor shall have the authority to compromise, settle, discontinue, abandon, dismiss, or otherwise resolve all such Causes of Action when the proposed settlement amount is to be less than $50,000 without notice and a hearing and without order of the Bankruptcy Court. All other settlements shall be subject to notice and a hearing pursuant to § 102(1) of the bankruptcy Code and a Final Order of the Bankruptcy Court approving the settlement.

Plan, Art. VIII, § 8.03, at pp 10.

In the Plan, "causes of action" was defined to mean "without limitation, any and all actions, causes of action, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims and demands whatsoever, whether known or unknown, in law, equity or otherwise." Plan, Art. I, § 2.01, at p. 2.

In December 2010, Mercury's Chapter 11 Plan was confirmed by the Bankruptcy Court. No final decree has entered. Mercury's Chapter 11 bankruptcy case is still open.

Mercury allegedly assigned its claims and potential claims against Comerica to the plaintiff in March, 2011. The plaintiff is a Colorado limited liability company. Its members are Jerrold Hauptman and his wife Sherri Hauptman. The purported assignment is not in the court record and the terms have not been disclosed.

In this action, the plaintiff seeks to recover damages from Comerica in the amount of at least $15 million based on claims that Comerica breached the Amended Credit Agreement. Def.'s Ex. D.

The plaintiff has not shown that it has standing to prosecute the subject claims.

Upon commencement of Mercury's Chapter 11 case, Mercury's potential claims against Comerica became property of the Mercury bankruptcy estate. *See* 11 U.S.C. § 541. Section 1141(b), 11 U.S.C. provides, "*Except as otherwise provided in the plan or the order confirming the plan*, the confirmation of a plan vests all of the property of the estate in the debtor." (emphasis added). Section 1123(b)(3), 11 U.S.C. provides in pertinent part:

> (b) Subject to subsection (a) of this section, a plan may–
>
> * * *
>
> (3) provide for--
>
>> (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
>>
>> (B) the retention and enforcement by the debtor, by the trustee, *or by a representative of the estate appointed for such purpose*, of any such claim or interest;

(Emphasis added).

Section 1123(b)(3)(B) governs a plaintiff's post-confirmation standing to enforce claims that belonged to the estate. *See Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160, 1191 (10th Cir. 2012) ("*Paige*"). Here the plaintiff lacks standing because Mercury's confirmed Plan does not appoint the plaintiff as a representative of the estate for the purpose of enforcing the claims against Comerica. The claims were not even disclosed in Mercury's Disclosure Statement. There is no evidence showing that MER is obligated to share any recovery with the estate.

Contrary to the plaintiff's allegations, Mercury could not have validly assigned the subject claims to MER after confirmation of the Plan. Mercury's confirmed Plan does not

contain any provision authorizing Mercury to assign claims or causes of action. Mercury's authority under Paragraph 8.02(d) is limited to authority to "investigate and prosecute or abandon all Causes of Action belonging to or assertible [sic] by the Estate." Such authority does not encompass the authority to assign causes of action.

Paragraph 8.03 of the Plan provides Mercury with the authority to "settle, discontinue, abandon, dismiss or otherwise resolve" causes of action without Bankruptcy court approval when the proposed settlement amount is to be less than $50,000, but requires notice and hearing and Bankruptcy Court approval for all other settlements. In this action, the plaintiff seeks to recover at least $15 million from Comerica. Mercury could not transfer an interest in the subject claims to the plaintiff without notice and hearing and approval of the Bankruptcy Court.

The plaintiff argues that the standing issue should be characterized as a question of real party in interest and requests "a reasonable time to join Connolly as a party and/or obtain any necessary approval or ratification from the bankruptcy court." (Pl.'s resp. at 19). The Bankruptcy Court is the appropriate forum for that request.

Because the plaintiff lacks standing, this court has no jurisdiction to address the question of whether the plaintiff has stated a viable claim of breach of contract.

Based on the foregoing, it is

ORDERED that the defendant's motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) is granted. This action is dismissed for lack of subject matter jurisdiction.

Dated:  February 13, 2013

BY THE COURT:

s/Richard P. Matsch

Richard P. Matsch, Senior District Judge